# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION

**CHANDRA TATE, et al.,**

      **Plaintiffs,**                       Case No. 1:21-cv-36

      v.                                  **JUDGE DOUGLAS R. COLE**

**EYEMED VISION CARE, LLC,**

      **Defendant.**

## OPINION AND ORDER

This putative class action lawsuit stems from a data breach of Defendant EyeMed Vision Care, LLC's email inbox, which compromised thousands of individuals' personally identifiable information and protected health information. Plaintiffs, on behalf of themselves and a putative class, now seek to settle their claims with EyeMed. They move, without opposition, for preliminary certification of the putative class and for preliminary approval of the settlement. For the reasons discussed below, the Court **GRANTS** Plaintiffs' Unopposed Motion for Preliminary Approval of Class Action Settlement (Doc. 47), **PRELIMINARILY CERTIFIES** a nationwide class, and **PRELIMINARILY APPROVES** the proposed class action settlement.

## BACKGROUND[1]

EyeMed is one of the largest vision benefits companies in the country. It offers various plans to more than sixty million members. (Consolidated Class Action Compl., Doc. 19, #222, 228). To provide its services, EyeMed collects members' personally identifiable information (PII) and protected health information (PHI), including their name, email address, physical address, financial information (e.g., health savings account and credit card account information), and medical history. (*Id.* at #221–22, 228). And if a member uses health insurance to obtain benefits, EyeMed also collects additional information like that member's birthdate and Social Security number. (*Id.* at #228).

But, according to Plaintiffs, EyeMed has not adequately protected its members' PII and PHI. Specifically, they point to a June 24, 2020, cyberattack, during which unknown bad actors accessed EyeMed's email account and sent phishing emails to addresses saved in that account. (*Id.* at #222, 231–32). A later investigation revealed that the hacked email account contained numerous EyeMed members' names, contact information, dates of birth, vision insurance account numbers, Medicaid or Medicare numbers, Social Security numbers, and other information. (*Id.* at #231–33). Problematically, EyeMed allegedly didn't discover the breach until July 1, 2020—a week later. (*Id.* at #231–32). Worse yet, Plaintiffs say that EyeMed failed to disclose the data breach to its insurance company affiliates for nearly three months and failed

---

[1] The Court cites the Consolidated Class Action Complaint (Doc. 19) in relaying the relevant background. But it notes that EyeMed, in the proposed class action settlement, denies any wrongdoing. (Doc. 47-1, #572).

to notify affected members for nearly six months. (*Id.*). Plaintiffs now suspect their PII is available on the dark web, making them susceptible to identity theft and financial fraud. (*Id.* at #224–25).

Shaken by the data breach, Plaintiff Chandra Tate filed this putative class action lawsuit, (Doc. 1), which later consolidated with Plaintiff Barbara Whittom's analogous lawsuit, (2/24/21 Not. Order).[2] In the Consolidated Complaint, Plaintiffs assert seven counts: a negligence claim based on traditional negligence and negligence per se theories of liability (although Plaintiffs label each theory as a separate claim), (Counts I, II); breach of implied contract (Count III); unjust enrichment (Count IV); and various claims for violations of California's consumer protection and medical regulation statutes (Counts V, VI, and VII). (Doc. 19, #252–69). Defendants moved to dismiss the Consolidated Complaint in its entirety. (Doc. 21). They argued that Plaintiffs lacked Article III standing to sue, and that, in any event, Plaintiffs failed to plausibly allege their claims. (Doc. 21-1, #307). The Court disagreed on the standing front, concluding that Plaintiffs had plausibly alleged a concrete injury.[3] (Op. & Order, Doc. 40, #494). But the Court agreed in part

---

[2] Plaintiff Alexus Wynn became a party in the Consolidated Complaint. (Doc. 19, #221, 227).

[3] Although Plaintiffs plausibly alleged a concrete injury at the pleading stage, the Court noted that it was a close call. (Doc. 40, #492–93). And "[a]t 'successive stages of the litigation,' a named plaintiff bears an escalating burden to demonstrate standing." *Earl v. Boeing Co.*, 339 F.R.D. 391, 411 (E.D. Tex. 2021) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)), *rev'd and remanded on other grounds*, 53 F.4th 897 (5th Cir. 2022). Whether preliminary (or final) approval constitutes a successive stage is an interesting question. For example, one court has noted in a related context that "the movant's burden of proof to establish standing at the class-certification stage is unclear." *Smith v. Miorelli*, 93 F.4th 1206, 1212 n.7 (11th Cir. 2024) (cleaned up). For purposes of this preliminary approval motion, the Court assumes "that the applicable standard [is] a pleading standard," *id.* (quotation omitted), and that

3

concerning the merits, and dismissed most of Plaintiffs' claims for failure to plausibly allege them, allowing only the negligence claim to proceed. (*Id.* at #504). So, as it stands, the negligence claim (based on a traditional theory of negligence—the Court did not reach Plaintiffs' negligence per se theory) is the only one pending.

After mediation and over a year of negotiating, the parties seek to bring this dispute to a close by settling Plaintiffs' and putative class members' claims. (Doc. 47). The proposed settlement agreement defines the class as "all natural persons who reside in the United States and to whom EyeMed issued notice of the Data Incident that certain Personal Data was impacted in the Data Incident." (Doc. 47-1, #581). And the proposed agreement releases "any and all past, present, and future claims and causes of action arising from the conduct alleged in the [Consolidated Complaint]." (*Id.* at #579–80, 594). EyeMed, in turn, agrees to pay $5,000,000 into a non-reversionary common fund that will settle putative class claims. (*Id.* at #596).

The fund administrator will disburse that common fund in five steps. First, the fund will pay taxes and tax-related expenses related to the common fund. (*Id.* at #597, 599). Second, the common fund will pay for administrative fees, class representative service awards and attorneys' fees (the amounts of which are yet to be determined, and which will be later subject to the Court's approval), and litigation expenses. (*Id.* at #595–97). Third, the fund administrator will disburse monies to class members with valid "Out-of-Pocket Loss Claims" (claims for which a class member has

---

Plaintiffs have thus met their burden. But the Court encourages the parties to address this issue in their briefing for final approval.

4

documented out-of-pocket losses "reasonably traceable" to the data breach up to $10,000 per individual) and valid "Lost-Time Claims" (claims for reimbursement for time spent remedying issues related to the data breach up to four hours at a rate of $25 per hour).[4] (*Id.* at #584, 597). Fourth, the common fund will cover pro rata payments to all class members who submit a valid claim. (*Id.* at #597–98). The baseline pro rata payment is $50, subject to a proportional increase or decrease depending on the number of claims submitted. (*Id.* at #583). And finally, if there are remaining funds after all that, one of three things could happen. The first option is for the parties to confer and agree in writing to redistribute the remaining funds to class members who submitted valid claims. (*Id.* at #598). If, however, the parties determine that redistribution is economically infeasible, the remaining funds will go to the unclaimed property funds of the states in which class members reside. (*Id.*). And if that is economically impractical, then the remaining funds will instead be paid to a non-profit charitable organization subject to the Court's approval. (*Id.*). On that score, the parties recommend the Electronic Privacy Information Center (EPIC)—a public interest research center that focuses on protecting privacy. (Doc. 47-2, #651, 670).

When it comes to attorneys' fees and class representative service awards, the proposed settlement agreement does not specify fixed amounts. Rather, the

---

[4] Out-of-Pocket Loss Claims include Lost-Time Claims. (*See* Doc. 47, #551 (explaining that "[c]laims for lost time … [are] capped at $100 subject to the $10,000 cap")). In other words, a class member who attests to four hours of lost time, and thus receives $100, could only obtain up to $9,900 in out-of-pocket losses.

5

agreement states that class counsel "will move the Court for an award of attorneys' fees not to exceed one-third [] of the Common Fund," and that "Plaintiffs intend to request a Service Award in the amount of $2,500 to each individual Plaintiff, also to be paid from the Common Fund." (Doc. 47-1, #595).

Kroll Settlement Administration, LLC, a company experienced in class action claim administration, will process class claims and distribute payments to the class; process and disburse attorneys' fee awards and service awards; and provide notice to the class. (*Id.* at #581, 585–86, 588–91, 597–600). To effectuate notice, Kroll will do a few things. First, it will create a settlement website that contains the long-form notice, the claim form, this preliminary approval order, the settlement agreement, and any other materials that the parties agree or that the Court orders should be included. (*Id.* at #589). The website will further allow class members to submit a claim form electronically. (*Id.*). Beyond the website, Kroll will also send short-form notices to class members' email addresses (which EyeMed will provide). (*Id.* at #588–90). If EyeMed doesn't have a class member's email, then Kroll will instead mail the short-form notice to the member's physical address (which EyeMed will also provide). (*Id.*). Finally, Kroll will establish a toll-free help line to answer settlement-related questions. (*Id.* at #590).

The Court has reviewed the proposed settlement agreement and Plaintiffs' unopposed motion for preliminary approval. And while the Court ordinarily does not do so, it also held a hearing on this preliminary approval motion on June 25, 2025, at the parties' behest. (6/25/25 Min. Entry). In short, the matter is ripe for review.

## JURISDICTION AND CHOICE OF LAW

This Court has subject-matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d). There are more than 100 putative class members, the amount in controversy exceeds $5,000,000,[5] and minimal diversity exists. Tate and Wynn are citizens of South Carolina, and Whittom is a citizen of California. (Doc. 19, #226–27). EyeMed is a limited liability company whose sole member (its parent company, Luxottica of America, Inc.) appears to be an Ohio citizen.[6] (*Id.* at #227); *Akno 1010 Mkt. St. St. Louis Mo. LLC v. Pourtaghi*, 43 F.4th 624, 627 (6th Cir. 2022) ("LLCs have the citizenships of their members."). And with at least one Plaintiff diverse from EyeMed, minimal diversity exists.

Satisfied that jurisdiction is present, the Court turns to another threshold issue. Before preliminarily certifying a nationwide class in a diversity action, the Court must ascertain which law applies to the putative class claims. *See Hawes v.*

---

[5] Although the settlement common fund totals $5,000,000 exactly (i.e., does not exceed $5,000,000), the Court finds that Plaintiffs had a good-faith basis for believing the amount in controversy exceeded $5,000,000, which is all that is required for federal jurisdiction. *Dart Cherokee Basin Operating Co. v. Owens*, 574 U.S. 81, 87–88 (2014).

[6] The Consolidated Complaint's allegations relating to EyeMed's citizenship are not as fulsome as one might hope. It says, for example, that EyeMed is a "Delaware limited liability company with its principal place of business in Mason, Ohio." (Doc. 19, #227). But the citizenship of an LLC is determined by reference to the citizenship of its members, not the state of its formation or its principal place of business. *Akno 1010 Mkt. St.*, 43 F4th at 627. That said, the Consolidated Complaint also alleges that EyeMed is a "wholly owned subsidiary" of Luxottica of America, Inc., (Doc. 19, #227), which the Court understands as alleging that Luxottica is the sole member of EyeMed. And while the Consolidated Complaint also fails to fully allege the citizenship of Luxottica (as it alleges only its principal place of business, not its state of incorporation), the Court has confirmed on the Ohio Secretary of State's website, of which the Court can take judicial notice, that Luxottica's state of incorporation is also Ohio. *Business Search: Luxottica of America, Inc.*, Ohio Sec'y State, https://perma.cc/437B-H4D3.

*Macy's Inc.* (*Hawes I*), Nos. 1:17-cv-754, 2:20-cv-81, 2023 WL 8811499, at *5 (S.D. Ohio Dec. 20, 2023); *In re Bridgestone/Firestone, Inc.*, 288 F.3d 1012, 1015 (7th Cir. 2002) ("No class action is proper unless all litigants are governed by the same legal rules."). The Court can make short work of that exercise here. Plaintiffs raise a common-law negligence claim on behalf of a nationwide class. And the Court has already determined that Ohio's version of negligence presents no conflict with other states' similar actions where the defendant has not alleged contributory or comparative negligence on the part of the plaintiff. *In re Cinfed Fed. Credit Union Data Breach Litig.*, No. 1:23-cv-776, 2025 WL 1637686, at *5 n.6 (S.D. Ohio June 10, 2025). That means the Court need not engage in an extensive choice-of-law analysis since Ohio's rules dictate that Ohio law applies where no conflict exists between the possibly applicable states' laws. *ISCO Indus., Inc. v. Great Am. Ins.*, 148 N.E.3d 1279, 1283 (Ohio Ct. App. 2019). Beyond that, the lack of obvious conflict means Ohio law may constitutionally govern the claims of the entire putative class. *See Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 816 (1985).

## LAW AND ANALYSIS

Federal Rule of Civil Procedure 23(e)(1)(B) directs a court to determine, at the preliminary-approval stage, whether it will likely be able to approve the proposed settlement agreement under Rule 23(e)(2), and to finally certify the class for purposes of judgment. Rule 23(e)(2), in turn, governs when a court may, assuming it has already certified a class, approve a class action settlement. That provision requires the Court to determine whether the proposed settlement is "fair, reasonable, and

8

adequate." Fed. R. Civ. P. 23(e)(2). At the preliminary-approval stage, then, the Court's task is to determine whether it is likely to (1) finally certify a class and (2) approve the substance of the settlement. In short, the Court must discern whether the settlement is a "fair, reasonable, and adequate" disposition of the class claims.

### A. Preliminary Class Certification for Settlement Purposes

Rule 23 allows a class to be certified only if:

> (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). And on top of the four Rule 23(a) requirements, each of which must be met, a class also must satisfy one of Rule 23(b)'s conditions. The parties here rely on Rule 23(b)(3), which requires "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."

#### 1. Numerosity, Commonality, Typicality, and Adequacy

The Court finds that all four Rule 23(a) requirements are met as to the nationwide class. The putative class, which numbers some 692,154 individuals, (Doc. 47, #548), clearly meets the numerosity requirement. *See, e.g.*, *Hunter v. Booz Allen Hamilton Inc.*, No. 2:19-cv-411, 2023 WL 3204684, at *3 (S.D. Ohio May 2, 2023) (finding that 647 class members meets the numerosity requirement).

9

Commonality and typicality are also satisfied. To demonstrate questions of law or fact common to the class, Plaintiffs must show that the putative class claims "depend upon a common contention" that is "of such a nature that it is capable of classwide resolution," such that determination of the contention's "truth or falsity" will resolve a central issue to the claims "in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). Typicality similarly requires that the named plaintiffs' claims "arise[] from the same event or practice or course of conduct that gives rise to the claims of other class members." *Miller v. Charter Nex Films - Delaware, OH, Inc.*, No. 2:18-cv-1341, 2020 WL 2896913, at *4 (S.D. Ohio June 2, 2020) (cleaned up).

Plaintiffs and the putative class members here premise their single remaining claim on one principal legal contention: EyeMed negligently secured their personal data. (Doc. 19, #241, 252–59). That sort of contention requires evidence of security measures EyeMed took (or didn't take) that would affect the class at large. In other words, answering the question does not require individualized proof; its truth or falsity is capable of resolution "in one stroke." *In re Cinfed*, 2025 WL 1637686, at *6 (quoting *Wal-Mart*, 564 U.S. at 350). Commonality and typicality are therefore present.

That leaves adequacy, which the Court likewise concludes is satisfied. Class representatives adequately represent the rest of the class when they (1) share common interests with the absent class members, and (2) "vigorously prosecute the interests of the class through qualified counsel." *Hunter*, 2023 WL 3204684, at *4

10

(quotation omitted). The Court finds that Plaintiffs' counsel has adequately prosecuted the interests of the class thus far and that Plaintiffs' interests largely align with the putative class members' interests. After nearly three years of litigating and negotiating a settlement agreement, Plaintiffs have secured a sizeable common fund given the class's size. (*See* Doc. 47-2, #649 (Plaintiffs' counsel providing a table listing other data breach class action settlement amounts, which reveals that this common fund is in the upper half, providing a recovery of roughly $7.22 per class member)). The Court does, however, note that the settlement agreement's provision of service awards for class representatives creates at least the *potential* of conflicting interests. *See Hawes v. Macy's Inc.* (*Hawes II*), Nos. 1:17-cv-754, 2:20-cv-81, 2024 WL 2125640, at *6 (S.D. Ohio May 13, 2024) (citing *In re Dry Max Pampers Litig.*, 724 F.3d 713, 722 (6th Cir. 2013)). The Court therefore directs Plaintiffs to remain mindful of the intended purpose of service awards—compensating class representatives for their efforts in seeking a benefit to the class, not providing class representatives a windfall—when making their later request for such awards. *Id.*

In sum, the Court finds that Rule 23(a)'s requirements are met for provisional certification purposes.

### 2. Predominance and Superiority

The Court likewise finds that the class action meets Rule 23(b)(3)'s requirements that (1) the question common to the class predominates, and (2) the class action mechanism is superior to other adjudication methods.

To evaluate predominance, the Court must consider whether "adjudication of questions of liability common to the class will achieve economies of time and expense." *Pickett v. City of Cleveland*, 140 F.4th 300, 310 (6th Cir. 2025) (quotation omitted). The Court must ask, in other words, "whether a common question is at the heart of the litigation." *Id.* (cleaned up). Here, the common factual question of what security measures EyeMed employed to secure personal data and the common legal question of whether EyeMed acted negligently form "the heart" of this lawsuit. The only potential differences among class members are the measure of damages incurred from the data breach. And on that front, the proposed settlement's multi-tier claim system—reimbursements up to $10,000 per class member for documented monetary losses ($100 of which can come from attested lost-time costs), and pro rata cash payments for all class members who submit valid claims—addresses that discrepancy.

As for superiority, the Court considers the difficulties of managing a class action, the alternative adjudication methods to a class action, and the nature of the class claims. *Martin v. Behr Dayton Thermal Prods. LLC*, 896 F.3d 405, 415–16 (6th Cir. 2018) (quotation omitted). A class action better addresses the claim at issue here than individualized claims would, and is thus more efficient than, and superior to, individualized litigation. If each class member were to prosecute his or her own claim, it would likely be cost prohibitive and not worthwhile given that the amount in dispute per head is relatively small. On the flip side, if EyeMed were required to

12

defend individual lawsuits, those costs could exceed the common fund. As a result, a class action is the superior mechanism.

The Court, in sum, finds that, at this preliminary stage, the common questions of law and fact predominate and that the class action vehicle is the superior method for resolving Plaintiffs' claims. Accordingly, the Court preliminarily certifies the proposed nationwide class as defined in the settlement agreement.

Moreover, the Court provisionally appoints Plaintiffs Chandra Tate, Barbara Whittom, and Alexus Wynn as class representatives. And upon considering the factors in Rule 23(g)(1), the Court concludes that Plaintiffs' counsel is experienced in handling class actions, knowledgeable on the applicable law, and will ably discharge their duties as class counsel. (*See* Doc. 47-2, #653–54, 656–67 (documenting counsels' qualifications and history of handling data breach class actions)). Accordingly, the Court provisionally appoints Bryan L. Bleichner of Chestnut Cambronne PA, and Lori G. Feldman of George Feldman McDonald, PLLC as class counsel for the class. Lastly, the Court appoints Kroll Settlement Administration LLC as the settlement administrator.

B.  **Fairness of the Proposed Settlement**

The Court now considers Rule 23(e)(1)'s second prerequisite to preliminary class action settlement approval—the fairness of the proposed settlement. In assessing fairness, the Court considers whether (1) the class representatives and class counsel have adequately represented the class; (2) the proposed settlement was negotiated at arm's length; (3) the settlement adequately compensates the class; and

13

(4) the settlement treats class members equitably relative to each other. *See Hawes I*, 2023 WL 8811499, at *10 (finding that Rule 23(e)(2)'s new factors subsume the factors described in *UAW v. Gen. Motors Corp.*, 497 F.3d 615, 631 (6th Cir. 2007)).

### 1. Adequacy of Representation

The Court finds, for the same reasons described above when preliminarily certifying a class, *see supra* Part A.1, that the class representatives and class counsel have adequately represented the interests of the class.

### 2. Arm's Length Negotiations

The Court is satisfied, based on class counsel's representation and the mutual concessions in the proposed settlement agreement, which took months to finalize, that the settlement was negotiated at arm's length and was not plagued by fraud or corruption. *See Todd S. Elwert, Inc., DC v. All. Healthcare Servs., Inc.*, Nos. 5:15-cv-2223, 3:15-cv-2673, 2018 WL 4539287, *2 (N.D. Ohio Sept. 21, 2018) ("Courts presume the absence of fraud or collusion unless there is evidence to the contrary." (cleaned up)).

### 3. Adequacy of Relief

The Court finds that the settlement agreement adequately compensates the class. Rule 23(e)(2)(C) instructs the Court to consider: (1) "the costs, risks, and delay of trial and appeal"; (2) "the effectiveness of any proposed method of distributing relief to the class"; and (3) "the terms of any proposed award of attorney's fees."[7]

---

[7] The parties identified no agreements (other than the settlement agreement) that are relevant to the Court's consideration, so the fourth adequacy of relief prong is not relevant. *See* Fed. R. Civ. P. 23(e)(2)(C)(iv).

14

Here, the potential costs and risks of litigation could be significant for both EyeMed and Plaintiffs. If this case proceeded to summary judgment or trial, EyeMed would face significant discovery costs concerning the data breach and would risk a sizeable adverse judgment. And if the class cannot prove that EyeMed failed to employ adequate security measures or that the data breach threatens consequences to the individuals whose PII was divulged, they risk recovering nothing. Settlement, in other words, efficiently resolves the claims, providing a benefit to the class, cost-savings to EyeMed, and risk avoidance to both.

As for distributing relief, the Court foresees no issues. This case centers on unauthorized access to PII and PHI in EyeMed's possession. And because that PII and PHI inherently identifies class members, the Court anticipates little difficulty in disseminating notice and providing payments to the class. Beyond that, as the Court explains further below, the settlement appropriately compensates class members in a multi-tier fashion according to their respective losses.[8] *See infra* Part B.4.

---

[8] The Court briefly notes that the settlement agreement's cy pres provision, (Doc. 47-1, #598), which would ordinarily give the Court pause, does not raise any significant concerns here. That's because the cy pres provision will come into play only if *both* the redistribution of remaining funds *and* the payment to state unclaimed property funds are economically infeasible. (*Id.*). And it's in precisely that limited circumstance that cy pres awards are considered fair. *Jones v. Monsanto Co.*, 38 F.4th 693, 698–99 (8th Cir. 2022) ("[U]nclaimed funds may only be distributed *cy pres* where existing class-member claimants have been fully compensated and further distribution to remaining class members is not feasible."); *see also Hawes I*, 2023 WL 8811499, at *15. More than that, the parties' suggested recipient—EPIC—seems to have a mission (data privacy) that's "consistent with the nature of the underlying action." *Hawes I*, 2023 WL 8811499, at *15 (quotation omitted). And in any event, before any remaining funds are paid to a cy pres recipient, the receiving organization must be "approved by the Court." (Doc. 47-1, #598). So the Court will have the opportunity to take a second pass at the ultimate recipient in the unlikely event that the cy pres provision becomes pertinent. All that together absolves the Court of any concerns on this front.

15

Lastly, the attorneys' fees award does not weigh against the adequacy of class recovery.[9] *Hawes I*, 2023 WL 8811499, at *12 (clarifying that class action settlements contemplating a separate, court-ordered award of attorney's fees do not create adequacy-of-relief concerns).

### 4. Equitable Treatment Among Class Members

The Court finds that the settlement equitably treats the class members for the most part. The agreement provides for pro rata payments to all class members who submit valid claims, which denotes equity. And it further contemplates higher payouts for class members who either attest to lost-time costs and/or can prove specific out-of-pocket losses. As the Court has previously noted, tiered-claim settlements are equitable if based on the strengths of a class member's claims, *Hawes I*, 2023 WL 8811499, at *12, which is just what the settlement here intends. So the Court is satisfied that the settlement agreement treats class members equitably.

But there's one other thing worth noting here. While class representative service awards do not *directly* impact the question of equitable treatment (given that the settlement agreement does not stipulate a fixed service award), those awards nonetheless *indirectly* impact the question of equitable treatment. The class representatives here intend to seek $2,500 in service awards—an amount five hundred times the expected pro rata payout. True, this case involved discovery, mediation, and lengthy negotiations in which the class representatives had some

---

[9] As with the potential service awards, the Court will scrutinize the amount of attorneys' fees actually sought as part of the final approval process.

16

level of involvement. (*See* Doc. 47-2, #649–50 (explaining the class representatives' involvement in this litigation)). Even so, such a substantial service award will require substantial justification. *See In re Cinfed*, 2025 WL 1637686, at *16–17. The class representatives should therefore be prepared to provide such justification when they ultimately seek their service awards.

### C.     Proposed Notice Plan[10]

That leaves the adequacy of the notice plan. "For any class certified under Rule 23(b)(3), the court must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." *Fidel v. Farley*, 534 F.3d 508, 513 (6th Cir. 2008) (cleaned up). And the notice must also be "reasonably calculated to reach interested parties" to satisfy due process. *Id.* at 514 (quotation omitted). Moreover, Rule 23(c)(2)(B) dictates that the notice describe: "the nature of the action"; "the definition of the class certified"; "the class claims, issues, or defenses"; that any class member may enter an appearance through an attorney or opt out; "the time and manner for requesting exclusion"; and "the binding effect of a class judgment on members under Rule 23(c)(3)."

After examining the proposed notice here, the Court finds that it satisfies due process requirements. The short-form notice provides the class definition, discusses

---

[10] At the preliminary approval hearing, the Court highlighted a couple of linguistic discrepancies in the parties' proposed notice materials (e.g., use of the word "including" in the class definition on the long-form notice, (*see* Doc. 47-1, #620–21)). The parties promptly revised that language and submitted updated notice materials to the Court via email. So in effectuating notice, the Court **DIRECTS** Kroll to use those updated materials.

the data breach that caused the lawsuit, describes the common fund the settlement creates (along with the tiered distribution scheme), and directs the reader to visit the settlement website. (Doc. 47-1, #636). It further instructs the class member on how to submit a claim form, opt out, or object. (*Id.*). All told, the short-form notice is easy to understand and conforms to *Fidel*'s requirements. The long-form notice (as edited) likewise meets the requisite standard for the same reasons. (*Id.* at #618–26). And the notice plan, which initially relies on email notice, supplemented with a website and telephone hotline, is reasonably calculated to reach the class members and takes the same approach as many other notice plans. *See, e.g.*, *In re Cinfed Fed. Credit Union Data Breach Litig.*, No. 1:23-cv-776, 2024 WL 6076646, at *7–8 (S.D. Ohio September 10, 2024); *Carmen v. Health Carousel, LLC*, No. 1:20-cv-313, slip op. at 30–31 (S.D. Ohio June 18, 2024) (located at docket entry 86).

The Court therefore approves the notice plan. EyeMed shall provide a list of class members to Kroll by August 12, 2025. Before commencing the notice process, Kroll shall post this Opinion and Order, the long-form notice, claim form, and proposed settlement agreement on the settlement website. Kroll shall then commence providing notice on September 12, 2025. Class members shall have until November 11, 2025, to opt out of the class or object to the settlement agreement, in the manner prescribed by the settlement agreement. All class members who do not timely submit a valid opt-out request will be bound by any final judgment this Court enters in this case and thereby enjoined from bringing or prosecuting any action relating to the claims released under the settlement agreement. Class members shall have until

December 11, 2025, to submit settlement claims, in the manner prescribed by the settlement agreement.

## CONCLUSION

For the foregoing reasons, the Court **GRANTS** the Unopposed Motion for Preliminary Approval of Class Action Settlement (Doc. 47). The Court further:

- **PRELIMINARILY CERTIFIES**, for settlement purposes only, the nationwide class as defined in the settlement agreement, (Doc. 47-1, #581);

- **PRELIMINARILY APPROVES** the proposed settlement agreement, (*id.* at #571–605);

- **AUTHORIZES** the distribution of notice in accordance with the notice plan described in the settlement agreement, (*id.* at #587–91), and use of the proposed claim form, (*id.* at #611–16);

- **PROVISIONALLY APPOINTS** Chandra Tate, Barbara Whittom, and Alexus Wynn as class representatives;

- **PROVISIONALLY APPOINTS** Bryan L. Bleichner of Chestnut Cambronne PA, and Lori G. Feldman of George Feldman McDonald, PLLC as counsel for the class;

- **PROVISIONALLY APPOINTS** Kroll Settlement Administration LLC as the settlement administrator;

- **ORDERS** that class members shall have one hundred five days from entry of this Opinion and Order to opt out of the class or to object to the proposed settlement, and one hundred thirty-five days to submit settlement claims;

- **ORDERS** that any class members who do not timely opt out of the settlement in the manner provided in the proposed settlement agreement will be bound by the terms of the settlement upon final approval of the same; and

- **SCHEDULES** the final approval hearing for January 7, 2026, at 1:00 p.m., in Courtroom 805.

**SO ORDERED.**

July 29, 2025
**DATE**

**DOUGLAS R. COLE**
**UNITED STATES DISTRICT JUDGE**