# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

| | |
|---|---|
| **CHANDRA TATE, *et al.*,** | Case No. 1:21-CV-00036 |
| Plaintiffs, | (Consolidated with Case No. 1:21-cv-55) |
| v. | Judge Douglas R. Cole |
| **EYEMED VISION CARE, LLC,** | **PLAINTIFFS' UNOPPOSED** |
| Defendant. | **MOTION FOR FINAL APPROVAL** |
| | **OF CLASS ACTION SETTLEMENT** |

Under Fed. R. Civ. P. 23(e), and this Court's Preliminary Approval Order (Doc. 48), Plaintiffs Chandra Tate, Barbara Whittom, and Alexus Wynn (collectively "Plaintiffs") individually and on behalf of themselves and all others similarly situated, respectfully move this Court for Final Approval of the preliminarily-approved Class Action Settlement. The $5,000,000 non-reversionary common fund is a solid recovery for the approximately 692,154 Class Members and is fair, reasonable, and adequate. Plaintiffs conferred with counsel for Defendant, who advised that the relief requested in this Motion for Final Approval of Class Action Settlement is unopposed.

In support hereof, Plaintiffs rely upon the following Memorandum; the Declaration of Terence R. Coates in Support of this Motion attached as **Exhibit 1**; the Declaration of Lindsey Marquez of Kroll Settlement Administration LLC in Connection with Final Approval of Settlement ("Kroll Decl.") attached as **Exhibit 2**; Plaintiffs' Unopposed Motion for Preliminary Approval (Doc. 47), previously granted (Doc. 48); Plaintiffs' Motion for Attorneys' Fees, Expenses and Class Representative Service Awards (Doc. 49); the documents filed in this action; and such other evidence or argument as may be presented to the Court at or before the January 7, 2026 Final Approval Hearing or as soon as practicable thereafter. For the Court's convenience, a Proposed Order Granting Final Approval of Class Action Settlement is attached as **Exhibit 3**.

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR**
**FINAL APPROVAL OF CLASS ACTION SETTLEMENT**

## I.    INTRODUCTION

The Class's meaningful recovery in this case is a $5,000,000 non-reversionary Common Fund[1] designed to cover all settlement costs and provide several broad forms of monetary relief to Class Members, including: (1) Pro-Rata Cash Payments of approximately $35 per valid claimant;[2] (2) reimbursement of documented Out-of-Pocket Losses up to $10,000 per valid claimant; and (3) reimbursement of up to four hours of Lost Time at a rate of $25 per hour (capped at $100) per valid claimant (subject to the $10,000 aggregate cap for Out-of-Pocket Losses). *See* S.A., Doc. 47-1 at PageID# 583-84, ¶ 2.1; Opinion, Doc. 48 at PageID# 689-90.

Additionally, Defendant has agreed to various business practice changes that will further protect Plaintiffs' and Class Members' Private Information in the future, including, but not limited to: (1) enhanced authorization requirements for individuals with access to Defendant's network; (2) providing additional mandatory security awareness training to Defendant's employees and provided reminders to all employees of the password complexity requirements; (3) updating Defendant's internal password reset requirements; (4) adding additional auditing mechanisms to identify weak passwords; (5) converting the mailbox at issue in the Data Incident to a delegated account; (6) enhancing Defendant's multi-factor authentication protocols; (7) shortening retention period for the mailbox at issue in the Data Incident; and (8) engaging a third-party vendor to perform an updated HIPAA security risk assessment. *Id*. at PageID# 584, § 2.2.

---

[1] All capitalized terms not defined herein have the same meaning as in the Settlement Agreement ("S.A."). Doc. 47-1.

[2] Pro rata payments were originally projected to be $50 each but are now projected to be roughly $35 due to the claim rate, which is higher than projected. The notices to Class Members explained the $50 projection was subject to increase or decrease depending on the number of claims made.

On July 29, 2025, the Court granted preliminary approval of the Settlement and conditionally certified the Settlement Class defined as: "all natural persons who reside in the United States and to whom EyeMed issued notice of the Data Incident that certain Personal Data was impacted in the Data Incident." S.A., Doc. 47-1 at PageID# 581, ¶ 1.40; Opinion, Doc. 48 at PageID# 689. In doing so, the Court found that the Settlement was "fair, reasonable and adequate" and that the Notice Plan provides "the best notice that is practicable under the circumstances," "including individual notice to all members who can be identified through reasonable effort[]" and satisfies "due process." Opinion, Doc. 48 at PageID# 693-94, 702.

The Court-approved notice plan has since been executed, and the circumstances have not changed to alter the Court's initial assessment that the Settlement here is fair, reasonable, and adequate. As of the opt-out date and objection date (Nov. 11, 2025), none of the 662,451 Class Members who were sent direct notice of the proposed Settlement filed objections, and only five requested to be excluded from the Settlement. Kroll Decl. ¶ 18; *see also* Coates Decl. ¶ 5. This case boasts a 7.63% claims rate (Kroll Decl. ¶ 14), which is well within the realm of reasonableness for data breach actions. Thus, because the Settlement is a significant result for the Class, particularly in view of the risks and delays involved in continued litigation, Plaintiffs respectfully request that the Court grant final approval of the Settlement, grant Plaintiffs' pending Motion for Attorneys' Fees, Expenses, and Class Representative Service Awards (Doc. 49), and enter a final order and judgment dismissing this case.

## II.  INCORPORATION BY REFERENCE

Plaintiffs incorporate by reference Plaintiffs' Unopposed Motion for Preliminary Approval ("Motion for Preliminary Approval" or "MPA") (Doc. 47) and Plaintiffs' Motion for Attorneys' Fees, Expenses, and Class Representative Service Awards ("Fee Motion") (Doc. 49).

Plaintiffs reference the Motion for Preliminary Approval (MPA, Doc. 47 at PageID# 548-50) and Fee Motion (Doc. 49 at PageID# 708-11) for a detailed explanation regarding the factual and procedural background that ultimately led to resolution of this matter. Plaintiffs also reference the Motion for Preliminary Approval (MPA, Doc. 47 at PageID# 551-52) for a thorough analysis of the benefits provided to Settlement Class Members (*i.e.*, pro rata cash payments, reimbursement of out-of-pocket losses, and reimbursement for lost time, in addition to business practice changes).

## III.    NOTICE TO THE CLASS

### A.    Notice Plan

Notice to the Settlement Class consisted of direct notice to individuals whose contact information was in Defendant's possession. *See* Kroll Decl. ¶¶ 6, 9. Defendant had contact information for 679,524 Class Members. *Id*. ¶ 6. Under the Parties' Settlement Agreement and the Preliminary Approval Order, Kroll formatted the Short Notice to be sent by mail and a Long Form Notice to be posted on the Settlement Website. *Id*. ¶¶ 8-9. The Notice advised Settlement Class Members of their rights to submit a claim, request exclusion from the settlement, object to the settlement, or do nothing, and the implications of each such action. *Id*. ¶¶ 8-9, Exs. C, D.  The Notices advised Class Members of applicable deadlines and other events, including the Final Approval Hearing, and how Class Members could obtain additional information. *Id*.

Upon receipt of the Class List from Defendant, Kroll reviewed the data to remove duplicates and ensure it was in proper format for distributing the Short Notice via U.S. Mail. *Id*. ¶ 6. To ensure that the Short Notice would be delivered to Class Members, Kroll compared the address data against the United States Postal Service ("USPS") National Change of Address ("NCOA") database and updated the data to a Settlement-specific database with the changes received from NCOA. *Id*. On September 12, 2025, Kroll mailed the Short Notice to the 679,524

Settlement Class Members for whom a valid mailing address was available. *Id*. ¶ 9. As of December 23, 2025, 5,431 Short Notices were returned to the Settlement Administrator by USPS with a forwarding address, and 5,399 of those were automatically re-mailed to the updated address and the remaining 32 were re-mailed by the Settlement Administrator to the USPS-provided updated address. *Id*. ¶ 10. As of December 23, 2025, 50,344 Short Notices have been returned by USPS. *Id*. ¶ 11. Of the 50,344 returned Short Notices without a forwarding address, 34,070 were re-mailed to updated addresses obtained from an advanced address search, and of those 799 were determined to be undeliverable for a second time. *Id*. ¶ 11.

**B.** **Settlement Website and Toll-Free Telephone Number**

Kroll prepared and maintains a Settlement Website at www.EyeMedDataSettlement.com that includes important dates and deadlines and Settlement-related documents, including the Class Action Settlement Agreement and Release, the Preliminary Approval Order, the Motion for Attorneys' Fees, Expenses, and Class Representative Service Awards, and a downloadable version of the Notice of Class Action Settlement and Claim Form. Kroll Decl. ¶ 8. The Settlement Website has been active since August 6, 2025 and has been visited by approximately 40,043 unique users and has logged 51,491 page views. *Id*. ¶ 8. Through the Settlement Website, Class Members were able to submit claims online and contact the Settlement Administrator. *Id*. ¶ 8. A Settlement-specific toll-free telephone number was included in the notices and on the Settlement Website for the purpose of allowing Settlement Class Members to make inquiries regarding the Settlement. *Id*. ¶ 7. The system is accessible 24 hours a day, 7 days a week, and will remain in operation throughout the settlement administration. *Id*. The toll-free telephone number is included in the Notice. *Id*. This telephone number is active and has been available to the public since August 1, 2025. *Id*.

### C.    Effectiveness of Notice Program

Kroll calculates that, through the Notice Plan described above, 97.48% of the Class received direct notice. Kroll Decl. ¶ 12. The deadline to submit a claim form was December 11, 2025. *Id.* ¶ 13. Kroll received 50,574 claim forms (24,231 via mail and 26,343 via the Settlement Website) producing a claims rate of approximately 7.63%. *Id*. ¶ 14. The expected pro rata cash payout per Class Member is approximately $35.55, with this amount to be further clarified as Kroll completes the claim validation process. *See Id*.  ¶ 14(c); Coates Decl. ¶¶ 9-10.

## IV.    LEGAL ARGUMENT

### A.    Plaintiffs Have Standing

Plaintiffs adequately allege concrete injuries sufficient to confer standing at the settlement approval stage. Although unnecessary, Plaintiffs also introduce evidence in support of standing through their previously-filed declarations. *See* Doc. 49-7 at PageID# 791-92, ¶¶ 3, 5; Doc. 49-8 at PageID# 796-97, ¶¶ 2-3; Doc. 49-9 at PageID# 801-02, ¶¶ 2-3.

Standing requirements apply to class actions "even at the settlement approval stage, as a 'court is powerless to approve a proposed class settlement if it lacks jurisdiction over the dispute, and federal courts lack jurisdiction if no named plaintiff has standing.'" *In re Equifax Inc. Customer Data Sec. Breach Litig.*, 999 F.3d 1247, 1261 (11th Cir. 2021) (quoting *Frank v. Gaos*, 586 U.S. 485, 492 (2019)). "On the other hand, only one named plaintiff must have standing as to any particular claim in order for it to advance." *In re Equifax*, 999 F.3d at 1261. "Once threshold individual standing by the class representative is met, a proper party to raise a particular issue is before the court [and] there is no further, separate 'class action standing' requirement." *Carolina Youth Action Project v. Wilson*, 60 F.4th 770, 779 (4th Cir. 2023) (quoting 1 Newberg and Rubenstein on Class Actions § 2:1 (6th ed. 2022)).

"There is no requirement that Article III standing be proved with evidentiary support at the settlement approval stage." *In re Fortra File Transfer Software Data Sec. Breach Litig.*, 794 F. Supp. 3d 1203, 1218 (S.D. Fla. 2025) (citing *In re Equifax*, 999 F.3d at 1261 n.8); *but see* Opinion, Doc. 48 at PageID# 688 n.3 (quoting *Smith v. Miorelli*, 93 F.4th 1206, 1212 n.7 (11th Cir. 2024) (indicating the evidentiary burden at class certification is unclear)). "Through the procedural mechanism of a class settlement, defendants 'are entitled to settle claims pending against them on a class-wide basis even if a court believes that those claims may be meritless, provided that the class is properly certified under Rules 23(a) and (b) and the settlement is fair under Rule 23(e).'" *In re Deepwater Horizon*, 739 F.3d 790, 807 (5th Cir. 2014) (citation omitted). "[I]t would make no practical sense for a court to require evidence of a party's claims when the parties themselves seek settlement under Rule 23(e)." *Id.*[3]

Regardless of the standard applied, standing is not often questioned *sua sponte* where plaintiffs have alleged cybercriminals intentionally stole their sensitive personal information because of the defendant's actions or inactions. *See*, *e.g.*, *Wilson v. Frontier Commun. Parent, Inc.*, No. 3:24-CV-1418-L-BW, 2025 WL 2421373, at *5 n.4 (N.D. Tex. June 20, 2025) ("Settlement Class members' claims stem from the Data Incident and Frontier's cybersecurity protocols …. The undersigned does not see any apparent issue with standing, nor has any party suggested it, accordingly the undersigned finds that an in-depth Article III standing analysis is not

---

[3] In *Frank*, the Supreme Court held that a class action settlement cannot be approved unless a "named plaintiff has standing," and it "remanded for the courts below to address the plaintiffs' standing in light of *Spokeo*." *Frank*, 586 U.S. at 492-93. On remand (sub nom.), the district court denied a Rule 12(b)(1) motion to dismiss the plaintiffs' claims for lack of standing under a pleading standard. *See In re Google Referrer Header Priv. Litig.*, 465 F. Supp. 3d 999, 1005 (N.D. Cal. 2020). The district court then granted final approval of class action settlement without further substantive discussion of standing. *See In re Google Referrer Header Priv. Litig.*, No. 5:10-CV-04809-EJD, 2023 WL 6812545, at *1 & n.1 (N.D. Cal. Oct. 16, 2023).

necessary here."); *see also Galaria v. Nationwide Mut. Ins. Co.*, 663 F. App'x 384, 388 (6th Cir. 2016) ("Where a data breach targets personal information, a reasonable inference can be drawn that the hackers will use the victims' data for the fraudulent purposes alleged in Plaintiffs' complaints."); *Salazar v. Paramount Glob.*, 133 F.4th 642, 647–48 (6th Cir. 2025) (finding that unauthorized disclosure of non-sensitive video viewership history on a sports website caused a concrete privacy injury).

Courts that have considered standing at the settlement stage in the data breach context have largely concluded that standing was satisfied because of injuries *alleged* by the named plaintiffs. *See, e.g.*, *In re Equifax*, 999 F.3d at 1261-65; *In re Retina Grp. of Washington Data Sec. Incident Litig.*, No. DKC 24-0004, 2025 WL 2030241, at *2-5 (D. Md. July 21, 2025); *In re Christie's Data Breach Litig.*, 767 F. Supp. 3d 12, 13-18 (S.D.N.Y. 2025); *Gilbert v. Bioplus Specialty Pharm. Servs., LLC*, No. 6:21-CV-2158-RBD-DCI, 2024 WL 1464083, at *4-9 (M.D. Fla. Feb. 1, 2024); *In re Cap. One Consumer Data Sec. Breach Litig.*, No. 119MD2915AJTJFA, 2022 WL 18107626, at *6 n.7 (E.D. Va. Sept. 13, 2022).

Under the same pleading standard applied in the cases above, this Court found that Plaintiffs had standing based on alleged injuries from scam calls, texts, and emails caused by the Data Incident. *See* Opinion, Doc. 48 at PageID# 688-89 n.3 (citing Opinion, Doc. 40, PageID# 492–93). Even if the evidentiary burden were higher (which would contradict the persuasive authority above), Plaintiffs have supported their injuries with declarations. Doc. 49-7 at PageID# 791-92, ¶¶ 3, 5; Doc. 49-8 at PageID# 796-97, ¶¶ 2-3; Doc. 49-9 at PageID# 801-02, ¶¶ 2-3. Therefore, the Court need not consider standing further.

### B. The Court Should Award Kroll's Reasonable Administration Expenses

Plaintiffs respectfully request that the Court award the reasonable cost of Kroll's

administration services, currently projected to be $775,265.70. Kroll Decl. ¶ 19. Plaintiffs did not

address Kroll's projected expenses in its fee motion because the settlement administration program

was still at an early stage (and therefore Kroll's projection would have been less reliable).

However, settlement administration fees and expenses are among the things the Court must

determine are fair, reasonable, and adequate. *In re Cinfed Fed. Credit Union Data Breach Litig.*,

No. 1:23-CV-776, 2025 WL 1637686, at *16 n.11 (S.D. Ohio June 10, 2025); *see also Keil v.*

*Lopez*, 862 F.3d 685, 703 (8th Cir. 2017) (considering whether administrative fees were

"unjustifiable" for purposes of calculating the overall benefit to the class). The Kroll Declaration

submitted in connection with this motion, in addition to the high rate of class members who were

reached with direct notice and ultimately submitted a claim, demonstrates that the cost of Kroll's

services are reasonable and necessary. Therefore, the Court should allow up to $775,265.70 to be

paid from the Common Fund to cover the cost of settlement administration.

### C.  Final Class Certification for Settlement Purposes is Appropriate

This Court preliminarily approved class certification for Settlement purposes on July 29,

2025. *See* Opinion, Doc. 48. Final class certification is appropriate at this juncture for the same

reasons. Plaintiffs incorporate by reference § IV(B) in the Motion for Preliminary Approval.

Plaintiffs' rationale remains unchanged, and there have been no objections or changes in the facts

or law that would necessitate reconsideration of the Court's preliminary analysis. *Cf. In re Advoc.*

*Aurora Health Pixel Litig.*, 740 F. Supp. 3d 736, 745 (E.D. Wis. 2024) ("The Court has no

independent basis to question whether final certification of the class as previously defined or

appointment of Plaintiffs as class representatives … is appropriate. Accordingly, the Court does

not disturb its earlier finding that the settlement class in this matter meets the requirements of

Rule23(a) and (b) and that Plaintiffs are appropriate class representatives."); *Desue v. 20/20 Eye*

*Care Network, Inc.*, No. 21-CIV-61275, 2023 WL 4420348, at *6 (S.D. Fla. July 8, 2023) ("Nothing has occurred in the interim to disturb the Court's conclusion that this case meets the prerequisites of Rule 23(a) and (b)(3), and certification for settlement purposes is appropriate."). Instead, subsequent events (like the success of the notice program and lack of objections) reinforce the Court's prior determination, warranting certification for final approval.

### D.    The Settlement Agreement Merits Final Approval

Pursuant to Rule 23(e), the Court may approve this Settlement if it determines it is "fair, reasonable and adequate." The determination of whether to grant final approval for the Settlement is left to the Court's "sound discretion[.]" *Lonardo v. Travelers Indem. Co.*, 706 F. Supp. 2d 766, 778 (N.D. Ohio 2010), *on reconsideration in part* (July 21, 2010) (citing *Bailey v. Great Lakes Canning, Inc.*, 908 F.2d 38, 42 (6th Cir. 1990)). "To assess fairness, the Court considers whether (1) the class representatives and class counsel have adequately represented the class; (2) the proposed settlement was negotiated at arm's length; (3) the settlement adequately compensates the class; and (4) the settlement treats class members equitably relative to each other." *In re Cinfed*, 2025 WL 1637686, at *7 (citing Fed. R. Civ. P. 23(e)(2)).[4] Applying these factors, the Court should grant final approval of the proposed settlement.

### 1.    <u>Adequacy of Representation</u>

The Court should find that the Class was adequately represented by Class Counsel and Plaintiffs for the same reasons explained in its order preliminarily approving this Settlement. *See*

---

[4] While Sixth Circuit precedent identifies seven factors for evaluating settlements, *see Int'l Union, United Auto., Aerospace, & Agr. Implement Workers of Am. v. Gen. Motors Corp.*, 497 F.3d 615, 631 (6th Cir. 2007), this Court has observed that these factors are "largely subsumed in the 2018 amendments to Rule 23," with each *International Union* factor finding a home within the current Rule 23(e)(2) framework. *Hawes v. Macy's Inc.*, No. 1:17-CV-754, 2023 WL 8811499, at *10 (S.D. Ohio Dec. 20, 2023). Accordingly, Plaintiffs address the Rule 23(e)(2) factors "in sufficient detail to also satisfy *International Union*." *Id.*

Opinion, Doc. 48 at PageID# 694-96, 699. Here, Plaintiffs and Class Counsel have adequately represented the class, as reflected by the work performed and the relief obtained. *See* Rule 23(e)(2)(C)(i). This is reaffirmed by the reaction of Settlement Class Members, none of whom have objected to the settlement, and only five of whom have excluded themselves. *Compare with In re Cinfed*, 2025 WL 1637686, at *8 (the reaction of class supported the adequacy of representation where no class members opted out and only one objected); *Hawes*, 2023 WL 8811499, at *11 (reaching similar conclusion in case with 59 opt-outs and no objections); *Olden v. Gardner*, 294 F. App'x 210, 217 (6th Cir. 2008) (79 objectors out of an 11,000-member class "tend[ed] to support a finding that the settlement is fair").

Additionally, the Settlement terms and the executed notice plan are adequate. In evaluating whether to grant final approval, courts consider the "adequacy of representation in relation to the settlement terms and notice process." *Hawes*, 2023 WL 8811499, at *11. Generally, notice of a proposed settlement must be the "best notice practicable." Rule 23(c)(2)(B). "[B]est notice practicable" means "individual notice to all members who can be identified through reasonable effort." *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 173 (1974). "Neither Rule 23 nor due process requires that every class member actually receives notice. Instead, 'notice suffices if it is reasonably calculated to reach the absent parties.'" *In re TikTok, Inc., Consumer Priv. Litig.*, 617 F. Supp. 3d 904, 927 (N.D. Ill. 2022) (quoting 3 William B. Rubenstein, *Newberg on Class Actions* § 8:36 (5th ed. 2011)).

The comprehensive notice plan designed by Class Counsel and executed by Kroll provided the best notice practicable under the circumstances. As part of this program, Kroll established a comprehensive class website and disseminated direct notice to Class Members by mail, including skip tracing and remailing upon unsuccessful deliveries. *See* Kroll Decl. ¶¶ 8-12. Kroll estimates

that through this notice program, approximately 97.48% of Class Members received direct notice (*id.* ¶ 12), which more than satisfies the requirements of Rule 23 and due process. *See Shy v. Navistar Int'l Corp.*, No. 3:92-CV-00333, 2022 WL 2125574, at *5 (S.D. Ohio June 13, 2022) (citing Fed. Jud. Ctr., *Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide*, at 3 (2010), www.fjc.gov/sites/default/files/2012/NotCheck.pdf (last visited Dec. 24, 2025)) (explaining that at least 70% of the class should receive notice).

The adequacy of the settlement terms, including the structure of the notice and claim administration program, is evidenced by the relatively high claim rate. *Compare* Kroll Decl. ¶ 14 (7.63% claim rate) *with In re Cinfed*, 2025 WL 1637686, at *3 (approving class action data breach settlement that resulted in 4.34% claim rate), *and In re Anthem, Inc. Data Breach Litig.*, 327 F.R.D. 299, 321 (N.D. Cal. 2018) (finding that a 1.8% claims rate reflects a positive reaction by the class), *and In re Target Corp. Customer Data Sec. Breach Litig.*, No. 14-md-2522, 2017 WL 2178306, at *1–2 (D. Minn. May 17, 2017), *aff'd*, 892 F.3d 968 (8th Cir. 2018) (approving data breach settlement with a claims rate of roughly 0.23%), *and Desue*, 2023 WL 4420348, at *9 ("26,165 claim form submissions . . . out of a Class of 3,976,023 individuals, or a 0.66% claims rate" was "within an acceptable range").

The notices also informed Class Members of: (1) the nature of the action; (2) the essential terms of the settlement, including the definition of the Class, the claims asserted, and the benefits offered; (3) the binding effect of a judgment if a Class Member does not request exclusion; (4) the process for objection and/or exclusion, including the time and method for objecting or requesting exclusion and that one may make an appearance through counsel; (5) information regarding the Class Representatives' request for Service Awards; (6) information regarding the payment of proposed Class Counsel fees; and (7) how to make inquiries about the Settlement. *Compare* Kroll

Decl. ¶ 8, Exs. C, D *with* Fed. R. Civ. P. 23(c)(2)(B).

For these reasons, the Court should find the adequacy of representation requirement satisfied.

### 2. **Arm's-Length Negotiations**

Settlements resulting from arm's length negotiations conducted by court-approved counsel are presumptively reasonable. *See* 1 Herbert B. Newberg & Alba Conte, Newberg on Class Actions, § 11.41 at 90 (4th Ed. 2002); *see also Roland v. Convergys Customer Mgmt. Grp. Inc.*, No. 1:15-CV-00325, 2017 WL 977589, at *1 (S.D. Ohio Mar. 10, 2017) (noting that settlement was "reached after good faith, arms' length negotiations, warranting a presumption in favor of approval"); *Brotherton v. Cleveland*, 141 F. Supp. 2d 894, 906 (S.D. Ohio 2001) (absence of any evidence suggesting collusion or illegality "lends toward a determination that the agreed proposed settlement was fair, adequate and reasonable").

Here, the Parties engaged in arm's-length negotiation to reach the proposed settlement. These negotiations took place between counsel with extensive experience in handling class actions, including data privacy class actions such as this one. *See* MPA Decl., Doc. 47-2 at PageID# 641-43, ¶¶ 3-6; Fee Decl., Doc. 49-1 at PageID# 735-39, ¶¶ 19-24. Settlement negotiations in this case took place over the course of several months and involved a full-day mediation session with experienced mediator Bennett G. Picker that, while unsuccessful, ultimately resulted in a mediator's proposal that resulted in the Parties achieving a settlement in principle. *See* MPA Decl., Doc. 47-2 at PageID# 643-45, ¶¶ 9-13; Fee Decl., Doc. 49-1 at PageID# 733-35, ¶¶ 16-18. Thereafter, the Parties engaged in months of intense negotiations to finalize the terms of the Settlement. *See* MPA Decl., Doc. 47-2 at PageID# 643-45, ¶¶ 9-13; Fee Decl., Doc. 49-1 at PageID# 733-35, ¶¶ 16-18. No collusion existed during the settlement process. *See id.*

The record in this case overwhelmingly supports the conclusion that the non-reversionary settlement was negotiated at arm's length. Nothing has changed since the Court's preliminary approval order to indicate otherwise. *Cf. Todd S. Elwert, Inc. DC v. All. Healthcare Servs., Inc.*, Nos. 5:15-cv-2223, 3:15-cv-2673, 2018 WL 4539287, at *2 (S.D. Ohio Sept. 21, 2018) ("[C]ourts presume the absence of fraud or collusion unless there is evidence to the contrary.") (citation omitted). Therefore, the Court should conclude that the Settlement Agreement in this case was reached at arm's length.

### 3. <u>Adequacy of Relief</u>

Pursuant to Rule 23(e)(2)(C), courts contemplate whether "the relief provided for the class is adequate." In making such a determination, courts weigh the following factors: "'the costs, risks and delay of trial and appeal'; (2) 'the effectiveness of any proposed method of distributing relief to the class'; and (3) 'the terms of any proposed award of attorney's fees.'" *In re Cinfed*, 2025 WL 1637686, at *9 (quoting Fed. R. Civ. P. 23(e)(2)(C)).[5]

#### i. *Costs, Risks, and Delay of Continued Litigation*

First, like the data breach settlement in *Cinfed*, "[t]he adequacy of the settlement's proposed relief far outweighs the potential costs and risks of continued litigation." *In re Cinfed*, 2025 WL 1637686, at *9. Indeed, "Most class actions are inherently complex and settlement avoids the costs, delays and multitude of other problems associated with them." *Brent v. Midland Funding, LLC*, No. 3:11-CV1332, 2011 WL 3862363, at *16 (N.D. Ohio Sept. 1, 2011) (quoting *In re Austrian & German Bank Holocaust Litig.*, 80 F. Supp. 2d 164, 174 (S.D.N.Y. 2000)). "Thus,

---

[5] There are no agreements between the Parties (other than the Settlement Agreement). *See* Coates Decl. ¶ 3. Therefore, the fourth adequacy-of-relief prong is inapplicable. *See In re Cinfed*, 2025 WL 1637686, at *9 n.9 (citing Fed. R. Civ. P. 23(e)(2)(C)(iv)); *Carmen v. Health Carousel, LLC*, No. 1:20-CV-313, 2025 WL 892586, at *12 n.9 (S.D. Ohio Mar. 24, 2025).

. . . 'unless the settlement is clearly inadequate, its acceptance and approval are preferable to lengthy and expensive litigation with uncertain results.'" *Brent*, 2011 WL 3862363, at *16 (quoting 4 Herbert B. Newberg & Alba Conte, Newberg on Class Actions § 11.50 (4th ed. 2002)).

This present litigation is no different, given that it is a data privacy class action and a settlement at this stage of the case will avoid the costs, delays, and multitude of other problems associated with class action cases. *See Brent*, 2011 WL 3862363, at *16; *see also* Opinion, Doc. 48 at PageID# 700 ("Here, the potential costs and risks of litigation could be significant for both EyeMed and Plaintiffs."). Due at least in part to their cutting-edge nature and the rapidly evolving law, data breach cases like this one generally face substantial hurdles on the merits. *See In re Wasserstrom Holdings, Inc. Data Breach Litig.*, No. 2:23-CV-2070, 2025 WL 1563548, at *7 (S.D. Ohio Apr. 11, 2025) ("Because they involve new technology and evolving law, the merits of data breach cases like this one are often uncertain."); *Hammond v. The Bank of N.Y. Mellon Corp.*, No. 08 Civ. 6060, 2010 WL 2643307, at *1 (S.D.N.Y. June 25, 2010) (collecting data breach cases dismissed at the Rule 12(b)(6) or Rule 56 stage).

Class certification is another hurdle that would have to be met—and one that has been denied in certain other data breach cases. *See Cheryl Gaston v. FabFitFun, Inc.*, No. 2:20-CV-09534, 2021 WL 6496734, at *3 (C.D. Cal. Dec. 9, 2021) (noting that "data breach cases have experienced minimal success in moving for class certification"). While some courts (including within the Sixth Circuit) have more recently granted contested motions for class certification in the data breach context, it takes years of intense litigation just to reach that point. *See, e.g., Savidge v. PharmSave, Inc.*, 727 F. Supp. 3d 661 (W.D. Ky. 2024) (certifying contested class of employees whose Social Security numbers were stolen in data breach after roughly seven years of litigation). Further, if Plaintiffs were successful in obtaining certification of a litigation class, the certification

would not be set in stone. *Long v. HSBC USA Inc.*, No. 14 CIV. 6233, 2015 WL 5444651, *4 (S.D.N.Y. Sept. 11, 2015) ("A contested motion for certification would likely require extensive discovery and briefing, and, if granted, could potentially result in an interlocutory appeal pursuant to Fed. R. Civ. P. 23(f) or a motion to decertify by defendants, requiring additional briefing."). Given the complexity of the issues and the amount in controversy here, the defeated party would likely appeal any decision on either certification or merits.

Through the Settlement, Plaintiffs and Class Members gain reasonable, tangible benefits without having to face the further risk of not receiving any relief at all. *See In re Cinfed*, 2025 WL 1637686, at *9 (noting that, "if the class failed to prove that Cinfed inadequately protected their data or that they faced real injury because of the data breach, it risks recovering nothing. The settlement thus provides an efficient mechanism to resolve this dispute with overall cost, time, and risk avoidance for all parties."); *Hawes*, 2023 WL 8811499, at *11 (comparing settlement benefits to what class members may have been entitled to through individual litigation). The relief afforded by this Settlement is fair and reasonable, especially when weighed against the anticipated cost, prolonged nature, and uncertain outcome of continued litigation.

Furthermore, the total $5,000,000 Common Fund for approximately 692,154 Class Members (value of roughly $7.14 per Class Member) is within the range of reasonableness when compared to various other common fund data breach settlements. *See* MPA Decl., Doc. 47-2 at PageID# 648-49, ¶ 26 (including chart of comparable settlements); Fee Decl., Doc. 49-4 at PageID# 771, ¶ 14 (similar); *see also New York State Tchrs.' Ret. Sys. v. Gen. Motors Co.*, 315 F.R.D. 226, 235 (E.D. Mich. 2016), *aff'd sub nom. Marro v. New York State Tchrs.' Ret. Sys.*, No. 16-1821, 2017 WL 6398014 (6th Cir. Nov. 27, 2017) ("In assessing the settlement, the Court must determine whether it falls within the range of reasonableness, not whether it is the most favorable

15

possible result in the litigation.") (internal citations omitted). Thus, the relief afforded by the Settlement is fair and adequate compared to the risk, duration, and expense of continued litigation.

### ii. *Effectiveness of Any Proposed Method of Distributing Relief to the Class*

Second, the method of distributing relief to Class Members is fair and effective. Because this class action relates to the unauthorized access to Class Members' Private Information that Defendant possesses, "providing payments to [C]lass [M]embers should prove relatively straightforward" as Defendant "already has their contact information." *In re Cinfed*, 2025 WL 1637696, at *9. This is demonstrated by the Notice Plan implemented by the Settlement Administrator, which achieved direct notice to 97.48% of Class Members. *See* Kroll Decl. ¶ 12.

Moreover, the tiered structure of relief offered through the Settlement is appropriate and fair, providing Class Members the opportunity to obtain recovery for out-of-pocket losses and lost time, in addition to pro rata cash payments. These benefits will be paid directly to valid claimants shortly after (within 30 days of) the Settlement's Effective Date. S.A., Doc. 47-1 at PageID# 599, ¶ 9.2. If a valid claimant elects to receive payment via check, they will have 90 days to cash the check before it is void. *Id.* at PageID# 604, ¶ 11.15. Valid claimants will have at least 60 days from the stale date (i.e., 180 days from the Effective Date) to request check reissuance. *Id.* The fairness and effectiveness of distributing relief supports final approval.

### iii. *Terms of Any Proposed Award of Attorneys' Fees*

Plaintiffs believe that the fees requested in their Fee Motion (Doc. 49) are reasonable under the circumstances. Regardless, the terms of the Settlement Agreement relating to attorneys' fees do not impact the Court's determination on adequacy of relief because the Settlement Agreement does not require the payment of attorneys' fees, but merely permits Class Counsel to seek them. *Compare* S.A., Doc. 47-1, PageID# 594-95, ¶ 7.1-7.5 ("No order of the Court, or modification or

reversal or appeal of any order of the Court, concerning the amount(s) of any attorneys' fees, costs, expenses, and/or Service Awards ordered by the Court . . . shall affect whether the Judgment is Final or constitute grounds for cancellation or termination of this Settlement Agreement."), *with In re Cinfed*, 2025 WL 1637686, at *9 (explaining that the fee provision in the settlement agreement did not impact the adequacy of relief even though the Court had concerns about the requested fee), *and Carmen v. Health Carousel, LLC*, No. 1:20-CV-313, 2025 WL 892586, at *12 (S.D. Ohio Mar. 24, 2025) ("[T]he terms of any proposed attorneys' fees don't present any bar to final approval of the amended settlement agreement itself. The agreement, after all, doesn't hinge on any specific award of attorneys' fees . . . .").

Additionally, and as explained more fully in Plaintiffs' Fee Motion, the requested fees are fair, reasonable, and routinely approved by Ohio state and federal courts alike. Doc. 49 at PageID# 713-15. Therefore, the terms related to attorneys' fees do not weigh against final approval. Based on the foregoing, the Court should find that the relief, the method of distributing relief, and the terms related to attorneys' fees, are adequate and support final approval.

### 4. **Equitable Treatment Among Class Members**

#### i. *Class Member Relief*

Here, in accordance with Rule 23(e)(2)(D), Class Members are treated equitably relative to one another in that the Settlement provides a tiered system of relief that compensates first those class members who have suffered losses of time and/or money from the Data Breach, and second all class members who file a valid claim. *Compare* S.A., Doc. 47-1 at PageID# 583, ¶ 2.1, *with In re Cinfed*, 2025 WL 1637686, at *9 ("[T]he Settlement's two-tier distribution system for payments appropriately compensates first those class members who have suffered actual losses from the data breach, and second all class members who file a valid claim. Such an allocation suggests fairness.

. . . A tiered-claims approach based on the strength of class members' claims, such as one proposed here, is equitable.") (internal citation omitted), *and Health Carousel*, 2025 WL 892586, at *12 ("Although the amended settlement doesn't 'treat members *equally*, it does treat them *equitably*'— that is, to the extent it differentiates between class members, it does so on fair and reasonable bases.") (quoting *Hawes*, 2023 WL 8811499, at *12) (emphasis in original)). The multi-tiered benefit system in this case similarly treats Class Members equitably—not just equally.

The projected Pro Rata Cash Payment of approximately $35 per claimant compares favorably to those made available in analogous data breach settlements utilizing pro rata cash payments in combination with compensation for lost time and documented out of pocket losses. *See* Coates Decl. ¶¶ 9-10. All Class Members will also benefit equally from Defendant's business practice changes. S.A., Doc. 47-1 at PageID# 583-84, ¶ 2.1. Thus, the relief to Class Members provided by the Settlement is equitable and supports granting final approval.

### ii. *Plaintiffs' Service Awards*

Likewise, the requested Service Awards in the amount of $2,500 for each of the named Plaintiffs does not alter the relevant analysis. As discussed in Plaintiffs' Fee Motion, the requested Service Awards are reasonable given Plaintiffs' extensive service to the Class. *See* Doc. 49 at PageID# 726-27 (noting that "[T]his case has been pending for several years, the Class Representatives participated in an extensive discovery process including responding to through discovery requests, and they have identified in detail their efforts pursuing this matter as representatives of the Class."); *see also*, Doc. 49, Exhibits 7-9.

And, significantly, even if the Court has concerns about the size of the requested service awards after its review of Plaintiffs' Fee Motion, (*see* Doc. 49, PageID# 726), it should not impact the Court's analysis regarding equitable treatment because the awards are merely requested—not

required. *Compare* S.A., Doc. 47-1 at PageID# 576, 580-81, 594-96, ¶¶ 1.17, 1.36, 7.1, 7.5 (explaining that requested Service Awards are subject to Court approval); *with In re Cinfed*, 2025 WL 1637686, at *9 (explaining that under similar circumstances, the settlement agreement's language on service awards did not impact the equitability analysis); *Hawes*, 2023 WL 8811499, at *13 ("Because Rule 23 does not prohibit these awards categorically and because the Settlement Agreement does not guarantee any particular amount of such an award here, the Court finds the Settlement Agreement treats class members equitably relative to each other.").

Finally, as discussed in greater detail in Plaintiffs' Fee Motion, the $2,500 Service Awards requested here are less than the amount routinely awarded recently in similar data breach class action settlements in this Circuit. *See* Doc. 49 at PageID# 725. This weighs in favor of approval.

## V.   CONCLUSION

Because the proposed Settlement is fair, adequate, and reasonable, Plaintiffs respectfully request that the Court grant final approval of class action settlement in the form of the proposed Order attached as **Exhibit 3**, including awarding Service Awards in the amount of $2,500 to each of the named Plaintiffs, reasonable attorneys' fees in the amount of $1,666,666.66, actual litigation expenses of $38,822.40, and Kroll's administration expenses (projected to be $775,265.70), and that the Court order Kroll to distribute the remaining funds to the Class Members in accordance with the terms of the Settlement Agreement.

Dated: December 24, 2025          Respectfully submitted,

*/s/ Terence R. Coates*
Terence R. Coates (0085579)
**MARKOVITS, STOCK & DEMARCO, LLC**
119 East Court Street, Suite 530
Cincinnati, Ohio 45202
Telephone: (513) 651-3700
Facsimile: (513) 665-0219
*tcoates@msdlegal.com*

***Plaintiffs' Interim Liaison Counsel***

Bryan L. Bleichner (*pro hac vice*)
**CHESTNUT CAMBRONNE PA**
100 Washington Avenue South, Suite 1700
Minneapolis, MN 55401
Phone: (612) 339-7300
Fax: (612) 336-2940
*bbleichner@chestnutcambronne.com*

Lori G. Feldman (*pro hac vice*)
**GEORGE FELDMAN MCDONALD, PLLC**
102 Half Moon Bay Drive
Croton-On-Hudson, NY 10502
Phone: (917) 983-9321
Fax: (888) 421-4173
*LFeldman@4-Justice.com*

***Interim Co-Lead Counsel for Plaintiffs and the Class***

Gayle M. Blatt (*pro hac vice*)
**CASEY GERRY SCHENK FRANCAVILLA
BLATT & PENFIELD, LLP**
110 Laurel Street
San Diego, CA 92101
Phone: (619)238-1811
*gmb@cglaw.com*

Melissa R. Emert (*pro hac vice*)
**KANTROWITZ, GOLDHAMER
& GRAIFMAN, P.C.**
747 Chestnut Ridge Road
Chestnut Ridge, NY 10977
Tel: (866) 680-1835
*memert@kgglaw.com*

***Plaintiffs' Interim Executive Committee***

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 24, 2025, I served the foregoing upon counsel for all parties by filing it with the Court's electronic-filing system in accordance with Fed. R. Civ. P. 5(b)(2)(E) and S.D. Ohio Civ. R. 5.2(b).

*/s/ Terence R. Coates*
Terence R. Coates (0085579)
